## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**OHIO ASSOCIATION OF
ELEMENTARY SCHOOL
ADMINISTRATORS**, *et al.*,

        **Plaintiffs,**

-v-
                                         **Case No.:  2:11-cv-068**
                                                **JUDGE SMITH**
                                                **Magistrate Judge Abel**

**EDUCATIONAL IMPACT, INC.,** *et al.*,

        **Defendants,**

-v-

**JULIE DAVIS,** *et al.*,

        **Third-Party Defendants.**

### OPINION AND ORDER

This matter is before the Court on Counterclaim Defendants Ohio Association of Elementary School Administrators, Foundation to Advance Childhood Education, and Standards-Aligned Instructional Leadership and Third-Party Defendants Julie Davis, Donald Baker, Kenneth Bernacki, and Joan Hogrefe's Motion for Summary Judgment as to all claims against them (Doc. 100).  Counter Claimant and Third-Party Plaintiff Educational Impact, Inc. has responded and this matter is ripe for review.  For the reasons that follow, the Court **GRANTS** the Counterclaim and Third-Party Defendants' Motion for Summary Judgment.

## I.    FACTS

The Ohio Association of Elementary School Administrators ("OAESA"), Foundation to Advance Childhood Education ("FACE"), and Standards-Aligned Instructional Leadership ("SAIL", collectively referred to as OAESA) are all closely affiliated, not-for-profit entities in Ohio that provide professional development for Ohio's elementary and middle school administrators.  Educational Impact ("EI") is a Pennsylvania corporation that is engaged in the business of selling professional development programs to educators throughout the country.

Beginning in 2002, EI and OAESA entered into a business relationship whereby EI would develop or provide professional development programs for OAESA members.  The first agreement was signed by former Executive Director of OAESA, Ronald Stebelton, and the owner of EI, George Elias, on November 1, 2002.  Between 2002 and 2007, the parties entered into numerous agreements and amendments to those agreements.  All of the contracts were interrelated and specifically referenced prior agreements entered into between the parties.  In addition to the agreement to develop programs, the agreements also included provisions regarding the sharing of revenues between EI and OAESA relating to the sale of certain digital assets to third parties.  However, only EI maintained "the right to market the online components to school districts or other educational organizations other than SAIL [Educators/Participants] . . ."  (EI's Exs. 5-6).  Mr. Elias of EI and Mr. Stebelton of OAESA worked closely together and made numerous presentations in an attempt to obtain grants for OAESA.  Additionally, Elias, Stebelton, and Dr. Davis worked closely in making the 360 degree self-assessment an exceptional learning product to be utilized by both entities.  The three also made presentations to different organizations promoting SAIL and EI.  Based on the relationship between the parties,

EI anticipated it would financially benefit and anticipated leveraging its relationship with OAESA in order to sell its products to major school systems in Ohio.  (Elias Dep. Vol. I, at 107-08).

In 2007, Mr. Stebelton informed Mr. Elias that OAESA was experiencing financial difficulties because OAESA did not receive a grant it was expecting.  To assist OAESA and help its own expansion, EI provided OAESA's SAIL participants with free subscriptions to the content of EI's online catalogue.  In exchange, OAESA agreed to waive all past and future royalty payments due from EI.  (Elias Dep. Vol. I, at 110-12).

In early 2008, the OAESA Board of Directors began to suspect that Mr. Stebelton was engaged in financial misconduct within the association.  Though Stebelton was continuing to report the finances of OAESA in a favorable light, the board members discovered that OAESA was behind on its bills, certain mandatory accounts were empty, and the organization was nearly bankrupt.  (Hogrefe Dep. at 21-24, 42-43, 51; Blankenship Dep. at 21; Baker Dep. at 53).  It was also discovered that Stebelton had diverted OAESA funds to a company he created for himself, Stebelton and Associates, LLC.  (Baker Dep. at 23-24, 50-51).  Based on these findings, Stebelton was terminated as Executive Director of OAESA on April 19, 2008.  Additionally, Stebelton's conduct was reported to the IRS.  Stebelton was subsequently indicted on April 12, 2011, and pled guilty to four counts of subscribing to a false federal tax return.  He was sentenced on March 7, 2012 to 12 months and one day on each count to be served concurrently with each other.  (*See U.S. v. Stebelton*, S.D. Ohio Case No. 2:11-cr-91).

Dr. Davis took over as interim Executive Director of OAESA.  The OAESA Board of Directors continued to investigate Stebelton's conduct and OAESA's finances.  It was

discovered that EI was one of OAESA's largest vendors, and during their six year business relationship, OAESA had paid EI approximately $1,000,000 for seven online programs and two 360 degree self–assessment tools with a personal learning plan.  (Davis Dep. at 102).  OAESA reached out to EI and Mr. Elias to better understand the business relationship.  The parties discussed the potential for future business opportunities.  OAESA also requested documentation to explain why EI received a million dollars.  OAESA asserts that EI refused to cooperate and therefore the initiated this action for declaratory relief.  (Davis Dep. at 61; Elias Dep. at 61-66).

EI describes that after Stebelton's termination, the relationship between the parties deteriorated.  Dr. Davis asked assistant business manager Liza Blankenship to review all documentation regarding EI.  According to Blankenship, Davis stated that EI was involved in the embezzlement of OAESA's funds which were then funneled back to Stebelton.  (Blankenship Dep. at 24-25).  Blankenship further testified that Davis said she wanted to "bring George Elias and Ron Stebelton down."  (*Id*. at 27-29); and she "did not want Educational Impact to be operating."  (*Id*. at 28).  According to Blankenship, statements to this effect were made on a weekly basis until she resigned her position with OAESA in early October 2008.  (*Id*. at 23-24, 50-51).  OAESA's executive administrative assistant during this time, Ashley Lawson, confirmed that Dr. Davis made these, or similar statements.  (Lawson Dep. at 13, 40-41).

In addition to statements made internally at OAESA, EI asserts that such "defamatory statements" were made outside.  Specifically, on July 2, 2008, Mr. Elias informed OAESA's counsel Mr. Conners by email that he had "heard from three different educators in Ohio that Ron Stebelton is under some kind of investigation regarding possible wrongdoing that could possible involve our company."  (OAESA 860).  Mr. Elias requested that OAESA cease making these

statements.  Mr. Conners assured Elias that he would instruct the OAESA board members to cease making any such statements.  (*Id.*).

EI, however, alleges that the statements did not stop and that OAESA board members told IRS agents that EI was involved in Stebelton's illegal wrongdoings.  As a result, EI and Mr. Elias were investigated by the IRS.

In May 2009, September 2009, and March 2010, Mr. Elias again informed Mr. Conners that the  defamation was continuing.  (Ex. 32 to EI's Response in Opp. to Summ. J.; Elias Dep. at 184-85).  Mr. Conners again told Mr. Elias that he would instruct the Board of Directors to cease making any of the alleged statements.  Mr. Elias asserts that he relied on Mr. Conners' statements and assumed that the defamation had ceased.  (Elias Dep. at 186).

In August 2010, EI approached Sheldon Van Deventer to join the sales force as an independent sales representative.  (Van Deventer Aff. ¶ 3; Elias Dep. at 166-67).  Van Deventer discussed EI with Lisa Wendell, a former OAESA board member.  Following that meeting, Mr. Van Deventer contacted Mr. Elias and informed him that educators in Ohio believed EI and Stebelton had been embezzling money from OAESA.  (Van Deventer Dep. at 17-18).

In addition to the alleged defamation, EI also alleges that OAESA was secretly competing with EI and making attempts to sell portion of the digital assets to EI customers and competitors in violation of the agreements between the parties.  EI references email correspondence from Dr. Davis attempting to sell the 360.  (See Exs. 37 and 38 to EI's Response).

EI alleges that since Stabelton's termination and the defamatory comments, EI has lost significant business.  EI alleges that potential clients would not return sales calls and school

districts that had purchased EI products did not renew their contracts.  (Elias Dep. at 122-23; 173-74; 177-78; and 181).

In an effort to obtain more information from EI, OAESA filed this declaratory judgment action on December 22, 2010, in the Franklin County Common Pleas Court.  Defendant EI removed the case to this Court and also filed counterclaims against OAESA, FACE, and SAIL for breach of contract and unjust enrichment.  EI also brought a third-party complaint against Donald Baker, Kenneth Bernacki, Julie Davis, and Joan Hogrefe (the executive committee of the OAESA Board of Directors) for various defamation-related claims.

The counterclaim and third-party Defendants have moved for summary judgment on all the claims asserted by EI against them.  The initial claims brought by OAESA against EI are not addressed in this Motion.

## II.    SUMMARY JUDGMENT STANDARD

The standard governing summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.,* 328 F.3d 870, 873 (6th Cir.

6

2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must view all the facts, evidence and any inferences that may permissibly be drawn from the facts, in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587. The Court will ultimately determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-53. Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir. 1978). The Court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Liberty Lobby*, 477 U.S. at 249; *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (*quoting Liberty Lobby*, 477 U.S. at 257). The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Liberty Lobby*, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The

7

Court may, however, enter summary judgment if it concludes that a fair-minded jury could not

return a verdict in favor of the nonmoving party based on the presented evidence. *Liberty Lobby*,

477 U.S. at 251-52; *see also Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish

that it is bereft of a genuine issue of material fact." *Street*, 886 F.2d at 1479-80. That is, the

nonmoving party has an affirmative duty to direct the court's attention to those specific portions

of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*,

260 F.3d 654, 665 (6th Cir. 2001).

## III. DISCUSSION

EI asserts counterclaims of commercial disparagement, defamation, tortious interference,

breach of contract, and unjust enrichment against OAESA, FACE, SAIL, Dr. Julie Davis,

Donald Baker, Kenneth Bernacki, and Joan Hogrefe. In a footnote in its response, EI withdraws

its claims against third-party Defendants Baker, Bernacki, and Hogrefe.[1] (Response at 2). The

Court will address the arguments of the parties with respect to these claims in turn. As a

preliminary matter, the Court will address the choice of law dispute between the parties.

## A. Choice of Law

The parties agree that Ohio law should apply to the defamation, commercial

disparagement, and tortious interference claims. However, the parties dispute the applicable law

governing EI's breach of contract claim. There are numerous agreements between EI and

---

[1] The Federal Rules of Civil Procedure do not provide for the withdrawal of claims in the footnote of a responsive pleading. Nonetheless, the Court will dismiss the claims against these third-party defendants and enter judgment in their favor.

OAESA that contain choice of law provisions. Some state that Pennsylvania law applies, while others say that both Ohio and Pennsylvania law applies.

"[A] federal court in a diversity case applies the law of the state in which is sits." *Jim White Agency Co. v. Nissan Motor Corp.*, 126 F.3d 832, 835 (6th Cir. 1997); *Davis v. Sears Roebuck & Co.*, 873 F.2d 888, 892 (6th Cir. 1989). The Ohio Supreme Court has adopted the Restatement of Law (Second), Conflict of Laws, Section 187 in applying the choice of law provisions in contracts. *See Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co.*, 453 N.E.2d 683, 686 (Ohio 1983). Section 187 of the Restatement provides: "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Rest. 2d Confl. § 187(1) (1971). However, there is a dispute as to which of the agreements even govern the parties in this case. Therefore, it is not clear which choice of law provision of the agreements should govern. Accordingly, the Court should apply Section 188 of the Restatement to determine which law applies. Under Section 188, the Court should consider: (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *Ohayon v. Safeco Ins. Co. of Ill.*, 91 Ohio St. 3d 474, 477 (2001).

The Court, however, does not believe that the aforementioned factors need to be considered as the parties have not identified any conflict of the laws of Ohio and Pennsylvania with respect to the basic contract law at issue in this case. Accordingly, the Court will apply Ohio law and reference Pennsylvania law if necessary.

9

**B.     Defamation**

EI asserts claims for defamation against the counterclaim and third-party Defendants. Specifically, EI alleges that OAESA Executive Director Julie Davis told OAESA employees Ashley Lawson, Liza Blankenship and Michelle Strunk that "she believed EI was involved with Ron Stebelton in embezzling funds from OAESA and/or paid Stebelton "kickbacks" for the business it obtained from OAESA and that she and the OAESA Board were going to make this a known fact to OAESA members." (Am. Counterclaim ¶ 44). Additionally, EI alleges that Julie Davis told SAIL participant and Ohio School Superintendent Lisa Wandel, the Ohio State Department of Education employee Debra Bockwrath, and Ashland University Professional Development Director Tom Lavinder the same statements described above. (Am. Counterclaim ¶¶ 41-43). EI also raises new claims for defamation for the first time in its response in opposition to the motion for summary judgment, including that Wendel made defamatory statements about EI to EI salesperson Sheldon Van Deventer and that school principal William White made defamatory statements about EI to Mr. Van Deventer.

OAESA argues that this Court should not give any consideration to EI's new theories of liability raised for the first time in a response in opposition to summary judgment. "The Sixth Circuit does not allow parties to advance new contentions in opposition to a summary judgment motion after ample time for discovery and amending the complaint." *Jeffries v. United States*, 2010 U.S. Dist. LEXIS 30426 (N.D. Ohio Mar. 30, 2010) (citing *Tucker v. Union of Needletrades, Indust. & Textile Employees*, 407 F.3d 784, 787-89 (6th Cir. 2005)). EI clearly knows how to file an amended counterclaim and third-party complaint as its most recent one was filed in May of 2012. EI's claims do not mention allegations of defamation by Wendel and

White.  Accordingly, allowing EI to proceed with such claims now would be prejudicial to the OAESA defendants.  Even if the Court permitted EI to proceed with these claims, they would fail for the reasons that follow with respect to the original defamation claims.

### 1.  Statute of Limitations

The counterclaim and third-party Defendants assert that EI's defamation claims are barred by the statute of limitations.  Ohio Revised Code Section 2305.11(A) provides that claims of defamation are subject to a one-year statute of limitations.  The statute of limitations begins to run on the date of publication, not the date of discovery of the defamation.  *Lewis v. DelCounty JVSD*, 161 Ohio App.3d 71 (2005).  Whether the statute of limitations has run on a counterclaim should be judged as of the date of commencement of the action as a whole, not as of the date of filing the counterclaim.  *Robert-Wey v. Seafla, Inc.*, 613 F.Supp. 1204 (S.D. Ohio 1985).  OAESA filed the original complaint in the Franklin County Court of Common Pleas on December 22, 2010 (Doc. 2).  Therefore, any alleged defamatory statements that occurred prior to December 22, 2009 would be time barred, which involves all the alleged defamatory statements in this case.

### 2.  Equitable Tolling

EI, however, argues that its claims for defamation must be considered as timely based on the doctrine of equitable tolling.  "Equitable tolling stops the running of the statute of limitations in light of established equitable considerations."  *Ruth v. Unifund CCR Partners*, 2009 U.S. Dist. LEXIS 17362 at *23 (N.D. Ohio Mar. 6, 2009).  To establish equitable tolling, a plaintiff must demonstrate that: (1) the defendant made a factual misrepresentation; (2) that was misleading; (3) that induced actual reliance which was reasonable and in good faith; and (4) it caused

11

detriment to the relying party.  *See Livingston v. Diocese of Cleveland*, 126 Ohio App. 3d 299, 314 (1998).  "Ohio courts of appeals have held that the doctrine of equitable tolling 'requires a showing of actual or constructive fraud by a party in the form of representations that the statute of limitations was larger than it actually was, promises of a better settlement if the lawsuit was not filed, or other similar representations or conduct.'" *Weikle v. Skorepa*, 69 Fed. Appx. 684, 688 (6th Cir. 2003).  Although Ohio courts recognize the doctrine of equitable tolling, they apply it rarely and only to prevent gross injustice to a plaintiff.  *Id.* at 687.

EI alleges that counsel for the OAESA Defendants Mr. Kevin Conners "convinced Mr. Elias and EI that they would be able to reach a better outcome by not filing suit."  (Response at 24).  There is no dispute that Mr. Elias sent Mr. Conners a number of emails stating that he was being defamed by OAESA representatives and that Mr. Conners responded that he would speak to his client.  The evidence further demonstrates that Mr. Conners did exactly what he told Mr. Elias he would, he spoke to his clients.  Under Ohio law, the "equitable doctrine only applies when there is a misrepresentation of some kind.  It does not apply merely when one party exerts an undue influence over another.  Thus, without evidence of some kind of misrepresentation, the statute of limitations is not tolled by a defendant's influence over a plaintiff." *Creaturo v. Duke*, 2005 Ohio 1342, ¶ 51 (Ohio Ct. App. 2005).  EI has not presented any evidence that Mr. Conners misrepresented anything to Mr. Elias.

EI claims it did not file suit because Mr. Conners made statements regarding settlement of the defamation claims.  Specifically, EI relies upon a statement by Mr. Conners to Mr. Elias: "that it is not worth the time to litigate, that it can be resolved."  (Response at 23; Conners Dep. at 70).  The Court has reviewed this statement and the testimony of Mr. Conners and the

evidence shows that Mr. Conners was attempting to resolve OAESA's contract claims, not the claims for defamation.   There is no evidence that Mr. Conners promised EI a better settlement on the condition that EI refrain from filing a lawsuit for defamation.  "In Ohio, a purported waiver of a statute of limitations must be shown by some act which in and of itself prevents the plaintiff from seeking his remedy in the courts, and must go beyond the proposition of mere conversation, negotiation and discussion unless it amounts, in its entirety, to turning the plaintiff from his course and misleading him." *Fiorini v. Speaker*, 2002 Ohio 3541, ¶ 35 (Ohio Ct. App. 2002).

Finally, even if EI could prove that there was a misrepresentation, it cannot establish that any reliance was reasonable under the circumstances.  "It is essential to the application of the principles of equitable estoppel that the person claiming to have been influenced by the conduct or declarations of another party to his injury should have been destitute of knowledge of the facts, or at least * * * of any convenient and available means of acquiring such knowledge, for if he lacks such knowledge he is bound to exercise reasonable diligence to obtain it." *Pedler v. Aetna Life Ins. Co.*, 23 Ohio St. 3d 7, 11 (1986).  As illustrated in the email correspondence between Mr. Elias and Mr. Conners, there is no question that Mr. Elias was aware of his rights to file a lawsuit for defamation.  If he truly believed that the OAESA representatives were continually defaming EI for two years, yet did nothing to protect its rights except make some phone calls and send some emails to opposing counsel, then there was no reasonable reliance or reasonable diligence by Mr. Elias or EI to protect its rights.  Accordingly, EI has failed to prove that equitable tolling applies in this case and EI's defamation claims are subject to the one year

statute of limitations.  As stated above, all of the alleged defamatory statements were made prior to December 22, 2009, and are thus time barred.[2]

**C.      Commercial Disparagement**

EI has failed to present any argument or evidence in opposition to OAESA's motion for summary judgment on the claim of commercial disparagement.  There is no evidence that OAESA ever disparaged the goods and services provided by EI.  In fact, Liza Blankenship testified that neither Dr. Davis, nor anyone else in OAESA ever said anything disparaging about the goods or services supplied by EI.  (Blankenship Dep. at 83).  Further, the commercial disparagement claim is duplicative of the defamation claim.  *See Toledo Heart Surgeons, Inc. v. Toledo Hosp.*, 154 Ohio App. 3d 694, 696 (2003).  Accordingly, OAESA is hereby entitled to summary judgment on EI's commercial disparagement claim.

**D.      Tortious Interference**

EI has alleged claims of tortious interference with a contract and tortious interference with business relations against the counterclaim and third-party defendants.  "The tort of interference with a business relationship occurs when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relationship with another."  *Geo-Pro Serv., Inc. v. Solar Testing Laboratories, Inc.*, 145 Ohio App.3d 514, 525 (2001).  The elements of tortious interference are: (1) a business relationship or contract; (2) the wrongdoer's knowledge of the business relationship or contract; (3) an intentional interference causing a breach or termination of the relationship or contract; and (4)

---

[2] The OAESA Defendants also argue that they are entitled to summary judgment on the merits of EI's defamation claims.  However, having found EI's claims are barred by the statute of limitations, the Court does not find it necessary to evaluate the merits of those claims.

14

damages resulting from the interference. *Id.* Therefore, EI must prove that the counterclaim and third-party Defendants "intentionally or improperly interfered with another's prospective contractual relations by either: (1) inducing or otherwise causing a third person not to enter into or continue with a prospective relation, or (2) preventing the plaintiff from acquiring or continuing a prospective relation." *Cecil v. Orthopedic Multispecialty Network, Inc.*, 2006 Ohio 4454 (Ohio Ct. App. 2006).

"The main distinction between tortious interference with a contractual relationship and tortious interference with a business relationship is that interference with a business relationship includes intentional interference with prospective contractual relations, not yet reduced to a contract." *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co.*, 774 N.E. 2d 775, 780-81 (Ohio Ct. App. 2002).

EI asserts that it had business relationships with numerous school districts in Ohio. OAESA, however, argues that EI did not provide it with evidence of such relationships. There is no question that EI was an OAESA vendor who provided Ohio school administrators access to online programs through OAESA. The existing contractual or business relationship was between EI and OAESA. However, EI has shown that it intended to leverage its relationship with OAESA members to generate additional business. Therefore, EI has demonstrated prospective business relations and the Court will assume that OAESA was aware of the potential relationships for purposes of this analysis.

The intentional interference alleged by EI is the same defamatory comments discussed above–the testimony from OAESA employees, Blankenship and Lawson, as well as the testimony from EI's agent Mr. Van Deventer. OAESA argues, and the Court agrees that EI has

15

failed to present any evidence that the defamatory statements were made outside of OAESA. Further, EI has failed to produce any evidence that a potential customer refused to do business with EI as a result of the alleged defamatory comments.  In fact, the evidence is contrary to EI's arguments.  ODE continued doing business with EI even after Stebelton's termination.  Ashland University terminated its contract with EI because Elias refused to take Stebelton's name off its programs, not because of any alleged defamation.  (Elias Dep. at 160-62).  Further, OAESA references invoices that show that EI continued to make sales after Stebelton's termination.  (*See* Response Ex. 50 ).

Finally, with respect to damages, EI alleges that prior to Mr. Stebelton's termination, EI's programs were "well-receivd by the Ohio principals in attendance at various educational market conferences.  However, following Mr. Stebelton's termination, when EI attended the EYP Program kickoff everything changed."  (Response at 39-40; Elias Dep. at 177-78).  EI urges the Court to infer that the defamatory statements induced the principals to not enter into contracts. However, EI has failed to produce even one potential client that would testify that it refused to do business with EI as a result of the alleged defamatory statements.

Accordingly, EI has failed to prove the necessary elements to maintain its tortious interference claims and the OAESA Defendants are entitled to summary judgment on those claims.

### E.    Breach of Contract and Breach of Duty of Good Faith and Fair Dealing

EI alleges the counterclaim and third-party Defendants breached their contract with EI by failing to pay for access to online programs.  Specifically, the Amended Counterclaim states:

> 88.    As set forth in greater details herein, on November 1, 2003, OAESA and
>         EI entered into a legally binding and enforceable contract whereby EI

agreed to provide OAESA/FACE/SAIL access to EI's entire array of 33 online programs.

89.    Under the terms of the contract, OAESA/FACE/SAIL was required to pay full cost for EI's entire array of online programs.

90.    Beginning in or around 2007 and continuing through 2010, OAESA/FACE/SAIL continued to receive full access to EI's entire array of online programs.  However, OAESA/FACE/SAIL did not make any payments to EI for access to any of the online programs.

91.    The nonpayment by OAESA/FACE/SAIL for access to EI's entire array of online programs constituted a material breach of the terms of the legally binding contract.

92.    The contract between OAESA and EI imposed a duty of good faith on the parties in the performance of the contract.

93.    As set forth in greater detail above, OAESA breached this duty based on the false statements made by Plaintiff about EI and George Elias.

(Am. Counterclaim ¶ 88-93).

In addition to seeking summary judgment on the aforementioned claims, the OAESA Defendants argue that EI has attempted to assert new breach of contract claims in its responsive brief.  Specifically, EI now alleges that OAESA breached a non-competition clause and breached a duty to cooperate with EI regarding the use of the programs and digital assets.  "Federal courts. . . have held that a plaintiff may not introduce a new claim or theory-one not found in the complaint-in response to a motion for summary judgment."  *San Francisco Residence Club, Inc. v. Baswell-Guthrie*, 2012 U.S. Dist. LEXIS 130717 (N.D. Al. Sept. 13, 2012).  Additionally, "[a] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."  *Neumann v. Plastipak Packaging, Inc.*, 2011 U.S. Dist. LEXIS 126096, 31-32 (N.D. Ohio Oct. 31, 2011).  Further, in *Priddy v. Edelman*, 883 F.2d 438 (6th Cir. 1989), the Sixth Circuit held that "[a] party is not entitled to wait until the discovery cutoff date has passed and a motion for summary judgment has been filed on the basis of claims asserted in

the original complaint before introducing entirely different legal theories in an amended complaint."

In addition, the fact that EI pled some breach of contract claim is not sufficient to allow the company to move forward with new breach of contract claims based on different facts and allegations. *See Jeffries v. United States*, 2010 U.S. Dist. LEXIS 30426 (N.D. Ohio March 30, 2010); *see also Baswell-Guthrie*, 2012 U.S. Dist. LEXIS at 222 (even though "plaintiffs do not assert an entirely new claim in their responsive brief," they could not assert a new basis and argument to support the claim pled in the complaint).

EI filed its Amended Counterclaim on May 4, 2012, alleging new claims, but failing to raise the aforementioned claims. Therefore, any new claims raised by EI in their responsive brief are not permissible and the Court will not consider these claims.

To prevail on a breach of contract claim, a plaintiff must show: "(1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damage or loss to the plaintiff." *EFA Assocs. v. Dept. of Admin. Servs.*, 2002 Ohio App. LEXIS 2438 (Ohio Ct. App. (10th Dist.) May 21, 2002) (*citing Allied Erecting & Dismantling Co. v. Uneco Realty Co.*, 146 Ohio App. 3d 136, 142 (Ohio Ct. App. (7th Dist.) 2001). "A valid and binding contract comes into existence when an offer is accepted." *Mécanique C.N.C., Inc. v. Durr Environmental, Inc.*, 304 F. Supp. 2d 971, 979 (S.D. Ohio 2004). Under Ohio law, "both parties must have a clear understanding of the terms of an agreement and an intention to be bound by its terms before an enforceable contract is created." *Arnold Palmer Golf Co. v. Fuqua Industries, Inc.*, 541 F.2d 584, 587 (6th Cir. 1976); *see also Scotts Co. v. Central Garden & Pet Co.*, 403 F.3d 781, 788 (6th Cir. 2005) ("An enforceable contract in Ohio arises from a meeting of the

minds, and must be specific as to its essential terms, such as the identity of the parties to be bound, the subject matter of the contract, consideration, a quantity term, and a price term.").

For purposes of this analysis, the Court finds that the parties entered into a valid contractual agreement.[3]  Under the terms of the November 1, 2002 and November 1, 2003 agreements between the parties, EI was to provide OAESA members with access to EI professional development programs for a fee.  (Am. Counterclaim ¶¶ 88-89).  EI, however, argues that the August 1, 2007 is the applicable agreement between the parties.  EI notes that it continued to provide OAESA with subscriptions to its online content free of charge pursuant to the terms of that agreement.  The agreement specifically states:

> Satisfactory completion of Obligations
> EI has satisfied all requirements of the Agreements, including the delivery of all online programs and digital content to OAESA/FACE/SE for the educators intended to be served by the OAESA grants.  OAESA/FACE/SE has made all payments due EI under the Agreements.

(Doc. 6, Ex. A).

Therefore, having agreed that this agreement supersedes all previous agreements of the parties, and stating that OAESA has made all payments due EI under the Agreements, then EI's counterclaim and third-party complaint for payment for access to the online programs fails. Further, as discussed above, EI's new breach of contract claims regarding the non-compete provision and the duty to cooperate were not previously alleged and untimely.  Accordingly, the OAESA Defendants are entitled to summary judgment on EI's breach of contract and breach of good faith and fair dealing claims.

---

[3] The OAESA Defendants appear to challenge the validity of the agreements entered into between EI and Mr. Elias and Mr. Stepleton.  However, for purposes of the breach of contract analysis, they assert that they have abided by the terms of the contract that EI alleges is valid.

**F.      Unjust Enrichment**

EI asserts that because the OAESA Defendants question the validity of all the agreements between the parties, it has pled unjust enrichment as an alternative to the breach of contract claim.  EI asserts that the "unjust enrichment claim stems from the August 2007 document evidencing modifications to the agreements and only seeks relief relating to the subscriptions EI provided to OAESA allowing OAESA to access EI's online academy."  (Response at 44).

Ohio courts have concluded that unjust enrichment and breach of contract are mutually exclusive theories of recovery.  *See, e.g., HAD Enters. v. Galloway*, 192 Ohio App. 3d 140 (2011); *see also Caras v. Green & Green*, 1996 Ohio App. LEXIS 3162, *11 (Ohio App. June 28, 1996).  "It is clearly the law in Ohio that an equitable action in quasi-contract for unjust enrichment will not lie when the subject matter of that claim is covered by an express contract or a contract implied in fact.  The mere fact that issues exist as to the creation of the contract or the construction of its terms does not alter this rule."  *Ryan v. Rival Manufacturing Company*, 1981 Ohio App. LEXIS 14729 (Ohio App. Dec. 16, 1981).

As the Court previously held in ruling on EI's breach of contract counterclaim, there was a contract (or contracts) between EI and OAESA.  Accordingly, EI's unjust enrichment claim fails as a matter of law.

## V.    CONCLUSION

For the reasons stated above, the Counterclaim and Third-Party Defendants are entitled to summary judgment on Counter Claimant and Third-Party Plaintiff Educational Impact, Inc.'s Counterclaims and Third-Party Complaint.  In light of EI's withdrawal of the claims against Third-Party Defendants Baker, Bernacki, and Hogrefe, this Court will enter final judgment in their favor on EI's claims against them.

This case remains pending as to the underlying claims brought by the OAESA Plaintiffs against Educational Impact, Inc.

The Clerk shall remove Document 100 from the Court's pending motions list.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**